235374 Scott E. Gammons v. Adroit Medical Systems Inc. at all. Arguments not to exceed 15 minutes per side. Mr. Lawhorn for appellant. Good afternoon. May it please the court, John Lawhorn of the Knoxville, Tennessee Bar representing the appellant and the plaintiff below, Scott Gammons. Good afternoon. Yes, your honor. Counsel, did you reserve five minutes for rebuttal? Is that accurate? That is accurate, your honor. Okay, you may proceed. I'm sorry to interrupt you. No problem whatsoever. Mr. Gammons, and I'm going to refer to him as the plaintiff or the appellant. We have a lot of Gammons running around in this case, and I'll do that. The plaintiff asserted five claims arising from his termination of employment with his family-owned business, Adroit Medical Systems. Those claims, the federal claims under the Taxpayer First Act, 26 U.S.C. 7623. Then he had a state law statutory retaliation claim as well as three common law claims reliant on interference and civil conspiracy. The district court dismissed all of those claims at summary judgment. I'd like to spend my limited time focusing primarily on the Taxpayer First Act, which I'll refer to as the TFA. Certainly, if the court wishes to direct my attention elsewhere, that's certainly acceptable. As the court is aware, the TFA adopts the shifting burdens of proof under 49 U.S.C. 42121B. The prima facie case showing of the employee under that statutory standard requires that the employee show that the protective conduct under the TFA was a contributing factor to the unfavorable personnel action alleged in the complaint. If the employee then makes that show, the employer must thereafter demonstrate by clearly convincing evidence that the employer would have taken the same unfavorable action in the absence of this behavior. Now, the prima facie case standard requiring and assuring that the protected activity was a contributing factor is very important in this case, even though it is a significantly more lenient standard than what we typically see from a causation standpoint in other statutory claims, such as the Blackboard standard or the Substantial Factor standard. This court in Conrail Corporation versus the United States Department of Labor in 2014 defined a contributing factor as any factor which alone or in connection with other factors tends to affect in any way the outcome of the decision. The district court's grant of summary judgment with respect to the TFA claim and the state statutory TPPA claim, Tennessee Product Protection Act claim, both were focused solely upon the supposed lack of any causation evidence presented by the plaintiff below to meet this contributing factor standard. Counsel? Yes, Your Honor. Thank you. Assume I agree with you about causation enough to satisfy the fourth factor of the prima facie case. And is it my understanding that then we move to the clear and convincing burden rather than apply the McDonnell-Douglas burden-shifting test? That is my understanding, yes, Your Honor. Okay. And so let's say we move to that factor. My understanding from our case was we ask if the employer can demonstrate by clear and convincing evidence that they would have taken this action, that they would have done this termination anyway, then the claim fails. And why is it not clear here that after the plaintiff, Scott Gammons, decided to put his father into a conservatorship and do a wholesale takeover of the company, why don't you think that is enough evidence that they would have terminated him even without the IRS reporting? Well, I think there's certainly two factors that would prevent that finding, certainly at the summary judgment stage. The first is the testimony, the deposition testimony of the elder Mr. Gammons, Clarence Gammons. His testimony is in the record where he states when he is first informed by his son, Scott Gammons, we file this conservatorship and I've made a report to the IRS. And by the way, the IRS is going to be on premises in two days. Mr. Gammons did not, he said he testified, and I decided at that moment to terminate Scott Gammons, my son. Right, but why couldn't that, I mean when you couple that with Jeff Gammons and what they did there, why couldn't you take those together to say it's clear and convincing evidence? It's pretty clear that Mr. Gammons, meaning that Clarence, was upset about the conservatorship, was upset about being displaced by his son, and was upset about his son taking over the company when he didn't feel like a conservatorship was appropriate. I mean even the probate court found that, that it was inappropriate. Well, I would disagree that the probate court found it was inappropriate. The primary finding of the probate court was that the spouse of the elder Mr. Gammons had legitimate powers of attorney to act on his behalf. That was the primary finding. The probate court found that Mr. Scott Gammons wasn't acting in his father's best interest. That finding was made in conjunction with the finding that the wife had the powers. But you're right about your original question. We also have, and this is the one piece of circumstantial evidence that the district court did actually address, as was presented by the appellant, and that's the January 23, 2020 text message communications between Ms. Kelly Catton, who is one of the individual defendants, and was ultimately on the board of directors, with her husband, Clarence Catton, who ended up on the board of directors on March 11th. If you recall, that's the text message addressing this report to the Adult Protective Services regarding their father. In that text message stream, there is the ultimate conclusion that this report was made by my client Scott Gammons. And the conclusion was made that this is his effort in the text message to take over the company, or to take over the business. Right, so why wouldn't that cut in their favor? Well, I guess we see it the other way. It somehow shows this. It shows that, again, keep in mind, these two actors ultimately ended up on the board of directors on March 11, 2020. They determined in January that my client was then attempting to take over the business, and nothing was done. No report made that we see. They certainly didn't continue this text message stream to anyone. It's different. They just accepted and nothing done. It was not until after they learned of the IRS report that the then client was terminated, Scott Gammons, because of that very reason. Counsel, can you hear me? I can. Okay, so trying to take over a company is different than putting your father into conservatorship so you can take over a company. So I think those are two different things. Okay, he's trying. We're worried about it. It actually could arguably be in their favor. He's trying. Then when you actually do the thing, and the court finds it was whatever you want to call it, improper, or undoes it, I can see that. And the fact that they not only took action against him, but Jeff and anyone else affiliated with it, seems to support their argument. Well, ultimately, given the deferential standard of the contributing factor test, it seems to me that would be a question of fact. And there are so many circumstantial evidence that the district court weighed facts and proceeded to make that determination. I guess the court really looked at that more from the intervening cost standard and not so much the defendant's burden because it never got there. Any other questions? Quickly, counsel. What did you allege were your client's damages? Statutory damages, I think it's double back pay, attorney's fees, and common law. We believe the statute also allows for typical damages, emotional distress, embarrassment, humiliation, and front pay. And are there places in the record where on summary judgment of those damages, like statutory damages, for example, are based on, as you said, back pay wages? Do we have anything on the record on that? To my knowledge, there was no issue in the summary judgment record on the client's damages, but within the complaint itself, we allege that it was in the appendix. Anything else? Thank you, counsel. Thank you. Counsel, hold on. Okay, we've got the clock reset. You may begin. Thank you, Your Honor. May it please the court, my name is Ed Scheich, and I'm here on behalf of the defendant's parties in this case, which are the employer, a joint, and then also the individual defendants. I'll jump right to the Taxpayer First Act. It seems like that's the focus of today's examination, but I'm happy to discuss any of the other four causes of action. But all of them live and die based upon the same factual allegations, and as proof of that, you can look to the complaint, which is R1 in the record, page 1. And we're describing what the case is. The plaintiff described that these causes of actions all relies on the same underlying facts, which is the termination of the stock damages. So moving on to the Taxpayer First Act, I think Your Honor's already jumped on one of the most critical pieces here, and that is the underlying emergency conservatorship. And there's actually a little bit more to it, because it is a race to economic issue here and full faith and credit issue. Because the underlying Tennessee State Court has already made the conclusive finding that this court must accept is true, that as Judge Bloom-Katz, you pointed out, that the plaintiff was not acting in his father's best interest and said that there's no reason for conservatorship. Well, it's a little bit of an unusual perspective here, because we have both an employee and a strong 80% owner that was put into the emergency conservatorship. But for purposes of the act, this is an employment discrimination retaliatory act. So put it in the context of the act, we have an employee here who has used judicial processes that turned out to be baseless on an emergency, not living process, ex parte basis to put himself in charge of his own employment. So from our perspective, and we assert today, that race to economy means that there is no question, with regard to the clear and convincing standard we talked about for the defendants here, that the defendants are able to meet their threshold and show that they have a non-discriminatory reason for this termination. So from the defendant's perspective, there's really only two focuses of this appeal. The full unburden of the plaintiff, which is the prima facie four factors, including causation, and then back in the pretext and whether the plaintiff is able to put up, through sheer weight, the evidence to show that this was the pretext. Well, but it has to be a contributing factor, so it could be one of two factors. That's exactly correct, Your Honor, but in order to be a factor, there has to be evidence in the record of something that took place. And it's our position today that there is absolutely no proof in the record, but certainly if we're on the back end of the pretext side, that it certainly does not meet the sheer weight standard that this court requires. Because really, and I think it's critical to remember that there's really a five day period that matters here. Because this is a matter of pure logic. An employer cannot retaliate for protected activity until that employer knows about protected activity. And that's the critical thing here. The plaintiff kept what he was doing completely secret from the other officers, the other directors, the CPA, or his family members, what he was up to until right at the last second. And the way that it became known to the defendants is because at the same time that the process server served Gene Gammons, the father, with the order of conservatorship depriving him of his liberty, it also had with it a summons to come to court, and then the lengthy, over 100 page petition that described all the bases for that emergency conservatorship. And very on page seven, it mentioned for the first time that to keep them in contact with the IRS. So we really just have a five day period here where that circumstantial evidence comes up. And you all have already discussed and asked my opposing counsel questions about this January 20 text message. And there's another equal to it in addition to the insightful questioning that your honors asked, which is that this is 30 hours before any knowledge of any protected activity. So it just is immaterial to the issues here. So once we focus in on this five day period, there's really only three pieces of evidence that we can discern from the briefing that the plaintiff is pointing to. It's three different text messages. And critically about those three, not a single one of them mentions IRS. Not a single one of them mentions OPT. Not a single one of them mentions expenses or anything related to any protected activity. So I'll go through the three very quickly here. When I ask you about Kelly's text that the IRS is not even a contributing factor, I find that to be particularly suspicious language. Which text is that going on? I can't remember. It's towards the end of 4226, towards the very end. It's like the last page of the text. It's page 11 of 11. It's 42-26, 11 of 11. She says, our pros that Jason Brush is able to see the truth. Scott calling the IRS was not even a contributing factor of his termination. I think I'm there, your honor. And what's interesting about that is if you go back, you can see the time frame of these different messages. And that's one of the three particular text chains we're talking about. If you go back, this is actually a text message between Kelly Patton, who is the stepsister of the plaintiff. And it begins back on the day of the emergency conservatorship hearing, the day that it was actually dissolved, March 10th. And this is a text message chain with a friend and asking for prayer leading up to this hearing. And if you look, it's page ID 920 and 919 where this text message begins. And I think that's actually more telling because this is Kelly Patton. Can I push back on that a little? Because the IRS seems to come out of nowhere. Like why even say it? And she does say, add attorneys now, earlier on, a couple days before. So it almost seems like someone put it in her mouth. Well, and that's insightful. Let me point you to page 924. At the top of that page, which precedes the part that you are reading about IRS, you can see the date stamp. And text messages don't work like emails do where it's a continuous thread of communication. What we have here is a significant jump in time. This date stamp on page 924 is August 28, 2020. This is after the plaintiff had already filed his initial complaint claiming that he was terminated for making an IRS complaint. This is six months after any of the events that are issued here. What is really at issue here are the events in that five-day period, which is March 7th through March 11th. I got you. So if you look at that time frame there, you see that there is no mention of the IRS. And I think, to the contrary, if you look at there and think, how am I going to describe a dispute, not knowing anyone in the future may see it, to a friend who knows nothing about it. And that's exactly what Ms. Patton does in her text chain on page 919 of the record. And she says here two different things. She said, long story short, one, Scott had an emergency conservatorship over Gene. Then she goes on and said, Scott took a position of president and majority shareholder. Not a single mention of IRS or anything at the time of the conservatorship or at the time when he left for termination. So there's just no mention of it at all. But another thing, if I can add another wrinkle to this, is that later, because of this, the board met. And in this change, you see this text message chain, in addition to the text message chain with Terry Patton's brother, where they're discussing the contemporaneous termination of Jeff Gaines. And yet, again, that's a critical character in a particular circumstance that is an issue here because at the same time that the board of directors voted, which is a critical distinction as well, at the same time that the board of directors voted to terminate the plaintiffs, they voted contemporaneously to terminate Jeff Gaines. And that is an important point because Jeff Gaines had nothing to do, absolutely nothing to do, with any protected activity. He did not report to the IRS. He did not have any involvement with his brother, the plaintiff, Scott Gaines, in making those reports. And nonetheless, at the same time the board was discussing termination of the plaintiffs, they were discussing termination of Jeff Gaines. So the only reason, and that was explained by all the different declarations of every single board member, including the two independent board members, that the reason why they terminated Jeff was because he was tangentially involved in the emergency conservatorship. But now we have Scott Gaines, who was terminated at exactly the same time, and everyone unanimously voted for that termination and explained that the reason was the emergency conservatorship. And he's not one step removed. He is the forefront of this baseless emergency conservatorship. He was the petitioner that was later found not to have been acting in his father's best interest. So once again, yes ma'am. Can I ask, if we are to disagree with you that the report to the IRS was maybe a contributing factor, that would get the plaintiff over that prima facie case, do you agree with your friend on the other side that then we don't follow the McDonnell-Douglas burden shifting, but instead follow the statute, and then we would ask if there's clear and convincing evidence that the employer would have taken the same action anyway had there not been the protected activity? So even if it wasn't contributing, if you had something else that we knew by clear and convincing evidence would have caused the termination alone, is that the inquiry we're doing? Well, that's an interesting question, Your Honor, because as you all know, this is a fairly new act, the Taxpayer First Act, and I don't think, I've tried to research and search it again before today's argument, I don't think this circuit, or I'm not familiar with any others, have actually answered the question of what standard applies under this act. We do believe that it is the regular McDonnell-Douglas framework, but I don't know that it matters because of this race to Dakota effect of this emergency conservatorship. To the extent that the court has already found that an employee acted in a way that was baseless, and in doing so took over his employer company, I just don't see how that is anything that can be overcome, and I don't think this court can second guess it, respectfully, because of the full faith and credit that is due to the Tennessee State Court. So, it just comes down to this, it cannot be just hypothetical doubt or speculation that will cause a plaintiff to survive summary judgment to meet either the front-end burden prima facie, or to show that the emergency conservatorship itself is a pretext for the sheer weight of circumstantial evidence. I'm not sure if what you're saying is that if you show a valid reason, you automatically have a defense without regard to whether something else also contributed. I mean, let's say there were clear emails saying, I can't believe he reported us to the IRS, this is crazy, and then there's this whole incident with the conservatorship. Are you saying that because the state court said that the conservatorship was groundless, that somehow that's the end of it, and it doesn't matter that there were emails about the IRS? No, Your Honor, I'm not trying to create a black-line rule of that magnitude. What we're focusing on solely with regard to the race you've got to affect the conservatorship is the defendant's burden. Because under the McDonnell-Douglas burden-shifting framework, the defendant has the obligation, once you make it past the prima facie, which we don't concede that the plaintiff does, but the defendant then has the obligation to show a non-discriminatory basis for the termination. And our position is, it's not just us saying that this is a non-discriminatory reason. The state court in Tennessee bolsters that, and in fact makes it that the defendants easily make it past that threshold. So now the burden shifts back to the plaintiff to show through the sheer weight of the circumstantial evidence that this is a pretext more likely than not. And that's where it just comes down to this. This is a classic summary judgment put-up case where the plaintiff admits he didn't have any direct knowledge, admits that he had no knowledge of any circumstantial proof that happened here, and is reliant entirely upon discovery. And despite robust discovery, including a series of forensic searches on cell phones to try to find unproduced text messages, the plaintiff has been utterly unable to put up any evidence whatsoever. And to the extent that these minor text messages within the five-day period amount to any evidence whatsoever, it's our position that it doesn't meet that sheer weight threshold that the Sixth Circuit requires for a plaintiff to avoid summary judgment in the pretext context. And related to that, we haven't really talked about, one of the hot-button issues I understand comes up a lot, which is temporal proximity. To the extent that we are on the back end of pretext, it is clear from Sixth Circuit law that temporal proximity may or may not be enough at the prima facie stage. In fact, I think Judge Tafari said in the right versus cellular sales case that there's been a mixed message about that. But it's certainly not a mixed message on the back end, which is the pretext side. It cannot, standing alone, be enough to satisfy the pretext. So you have to look what the other circumstantial proof is. Here, there's just none. There's three text messages within the five-day period, none of which mention the IRS, none of which mention an audit. So ultimately, I think the particular circumstances that drive the result here are the way-too-kind effect of the emergency conservatorship, the contemporaneous termination of Jeff Gammons for the conservatorship when he had no protective activity, and then three, the involvement not of the people who were acting in pure self-interest, but of the full board of directors, including two independent directors, who unanimously voted to terminate and all swore under oath that the reason was the conservatorship. Thank you very much. Any questions? Any further questions? Thank you, counsel. Thank you, Your Honor. Mr. Lawhorn, you may proceed. Thank you, Your Honor. When the motion was addressed, it was raised through the panel argument, which in our high-adjusted court, if I am incorrect, I do not recall this issue being addressed in the summary judgment record or in any of Patrick's briefs. If I am incorrect on that, I apologize, and I apologize to Mr. Shaw, but I don't believe that that point was raised at the district court that it was in the summary judgment record. To the extent there is an argument that can be presented at this stage, those two concepts are just not playing, and the district court certainly didn't include these at the first place. Different issues were presented in a probate matter. Different facts were considered in the term. There was no ruling in the probate court that is pertinent to the issues that were resolved by the district court below. So issue preclusion, claim preclusion, simply do not apply in this case at this stage. Getting back to the point on this, there came the defendant, but yet no case showed him that clearly convincing evidence to meet its burden under the TFA burden-shifting standard. Let me raise this as well. The defendants argued below that the reason they had to terminate Mr. Scott Gaines, the adult, was that he created this family dysfunctionality that could not be put back together as a result of this filing of the emergency concern issue. What is clear now in the record below, though, is that this dysfunctionality already existed. It existed both during the IRS report in 2008, and if you go back in the record, this was starting in December of 2019. Due to the animosity existing between Charlie Hawthorne and the plaintiff, in fact, this family relationship got to the point where Ms. Patton and her husband took over 40 boxes of financial records in the dark and light and moved them out of the business offices and placed them in a completely different building with a locking key to keep the appellant from having access to them. They denied the appellant in December or January of 2020 access to computer financial records of a group of medical assistants. They were doing that, yet they didn't terminate it. This high level of family dysfunctionality that was present, they did not terminate it. That's the difference. We have an IRS report. And we can say, look, we have a conservatorship filing as well. We have two things. And by the way, they were inextricably intertwined. It was not like the situation in the Randolph case decided by the district court and by the appellant, where that case was dealing largely with intervening causation. But this is not like the Randolph case, where you had a termination of an employee by one set of corporate actors and a disciplinary action being taken by a completely different set, acting independently and without knowledge of each side. Here, the family was dealing with all of it at one time. And so we have to go back to that contributing factor standing. And that is a factor, or to me, any factor, which alone, or in connection with other factors, tends to affect, in any way, the outcome of the discussion. Now, let me address temporary fraud simply, or very quickly. Because that plays into this very tight frame of time. And we have to look at the policy behind the Mickey case and the Hamilton case that's from 2008. That recognized that temporary fraud simply, even temporary fraud simply, stand by themselves. And what I would insert was these very limited cases where there is almost immediate protected activity, knowledge, and termination. And we've had to have that. But why? Because exactly what happened here, this group of defendants acted so quickly, so immediately, and in fact, it was less than 24 hours from the time that after the ruling by the Provo Court and the conservatorship proceeding, gave them power to act on behalf of the corporation. They acted. They acted within 24 hours. And you can't do that on purpose, tense your evidence, if you have that kind of time. And so we had to apply that. The District Court didn't do that. The Green Act, I should say, studied where we were at the time of the dismissal. Any further questions? Thank you very much, counsel. The case will be submitted. We appreciate your arguments.